UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MELODY J. D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:18 CV 402 (JMB) |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Deputy Commissioner of Operations, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security

Administration.  The parties have consented to the jurisdiction of the undersigned United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On December 12, 2014, plaintiff Melody J.D. filed applications for a period of disability

and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., and supplemental security

income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of September 24, 2014.

(Tr. 156-57; 158-61).   After plaintiff's applications for benefits were denied on initial

consideration (Tr. 68-81; 82-95), she requested a hearing from an Administrative Law Judge

(ALJ).  (Tr. 105-06).

Plaintiff and counsel appeared for a hearing on June 8, 2017.  (Tr. 28-67).  Plaintiff

testified concerning her impairments, daily activities, functional limitations, and past work.  The

ALJ also received testimony from vocational expert Delores E. Gonzalez, M.Ed.  The ALJ

issued a decision denying plaintiff's application on June 24, 2016.  (Tr. 10-23).  The Appeals

Council denied plaintiff's request for review on January 24, 2018. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Deputy Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability and Function Reports and Hearing Testimony

Plaintiff was born in May 1976 and was 38 years old on the alleged onset date. (Tr. 156). Plaintiff listed her impairments as bipolar disorder, depression, and anxiety disorder. (Tr. 175). Her parents paid her rent and utilities and purchased her medications for her. (Tr. 47, 57).

In January 2015, plaintiff completed a function report with the help of Patricia Rinkins, an independent living specialist with the Disability Resource Association. (Tr. 203-13). She reported that she lived with her three children. When asked to describe her daily activities, plaintiff stated that it was "a chore" to get up in the morning and make sure that her children ate breakfast and went to school. She did not have the initiative to do household tasks or attend to personal grooming. She did not cook but occasionally microwaved a frozen meal. Her children did all household chores. She required reminders to take her medications. She did not like to leave the house and only went out if "forced" or when taking her medication as prescribed. (Tr. 207). She was able to drive and went grocery shopping once a week, spending 15 to 30 minutes in the store. She was unable to concentrate enough to manage financial accounts, pay bills, or read. She was able to count change. She did not enjoy being around others and preferred to be secluded. She had great difficulty sleeping. She had difficulty with memory, concentration and attention and was unable to follow instructions. She did not handle stress or change well. In addition, she "always want[s] to be dead" and had suicidal thoughts on a daily basis. (Tr. 210). Plaintiff had difficulties with talking, seeing, memory, completing tasks, concentration,

understanding, following instructions, using her hands, and getting along with others.   Ms. Rinkins noted that she found plaintiff to be "extremely delicate."  (Tr. 213).   She "not only had difficulty responding to questions but also burst into tears a number of times."   Ms. Rinkins described plaintiff as a "person with many capabilities [who] is having a difficult time with her current state of anxiety and depression."   Id.

Plaintiff testified at the January 2017 hearing that she dropped out of school in the twelfth grade but subsequently obtained her GED.[1]   She took three or four classes at a community college but did not obtain a certificate or degree.  (Tr. 41-42).   In 1999, plaintiff was a passenger in a car that was struck by a drunk driver.  Her friend Nick, who was driving her car for her, was killed.   Plaintiff testified that, since that time, she had daily "visits" from him in which they spoke for about half an hour.   These hallucinations had worsened over time.   She had recently started taking the antipsychotic Invega[2] and thought that the episodes were a bit shorter.  (Tr. 42-44).   Plaintiff also testified that she had at least 15 suicide attempts over the course of her lifetime, starting at age 14.  (Tr. 44).   In late December 2016, she slit her wrists and was admitted to the hospital.   She stated that she had stopped taking her medication and went to a bar and drank two beers.  She felt that Nick was telling her to come "be with him."   When asked why she had stopped taking her medications, plaintiff testified that she "just didn't care."  (Tr. 46).   She isolated herself and stared at the walls.  She stopped eating, sleeping, or showering.  She did this about four times a week and sometimes stayed in bed for three or four days, looking at the

---

[1]  On October 21, 2016, a hospital physician noted that plaintiff had given inconsistent accounts of her education, variously stating that she had completed high school, had a GED, had some college, and earned a medical assistant certification.  (Tr. 640).

[2]  The Court has not located the record in which Invega was prescribed.

ceiling and thinking she should have been the one to die in the car accident.[3]  Her father was staying with her because he didn't want her to harm herself anymore.

Plaintiff testified that she was unable to sleep more than a couple hours at a time and woke up once or twice during the night, even when taking Ambien and trazadone.  (Tr. 47-48). She was unable to concentrate enough to finish what she began or to watch television, and she experienced anxiety "every day[,] all day."  (Tr. 42).  Twice a week, she smoked marijuana which helped with the anxiety.  (Tr. 50).  She had also taken cocaine in November and December 2016 in conjunction with suicide attempts.  (Tr. 50-51).  Plaintiff testified that she had panic attacks, during which her heart raced and she felt jittery and got "crazy."  (Tr. 52).  These attacks happened primarily when she was around other people but sometimes occurred when she was home.  These panic attacks lasted 15 to 20 minutes and occurred about once a day.  Afterwards, she felt tired and wanted to rest.

With respect to physical impairments, plaintiff had rotator cuff surgery in August 2016. She testified that she lost her Medicaid and so did not keep a follow-up appointment or attend physical therapy.  Her shoulder became infected after the surgery.[4]  (Tr. 55).  In addition, she had a cyst in her hip joint.

---

[3] Plaintiff also testified that when she was 14 she was with someone who fell off a cliff and was paralyzed.  She wondered whether she should have grabbed his hand and maybe he would not have been paralyzed.  (Tr. 49).  In October 2016, she reported to a doctor that she convinced her friend to jump off the cliff.  (Tr. 640).

[4] The infection was described as superficial and was treated with antibiotics.  (Tr. 622).

Vocational expert Delores Gonzalez was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience[5] who was limited to light work; could lift, carry, push or pull 100[6] pounds occasionally and 10 pounds frequently with only occasional overhead reaching; could sit for 6 hours in an 8-hour day, walk or stand for 6 hours in an 8-hour day; and who was limited to simple routine tasks with minimal changes in job setting or tasks, only occasional contact with coworkers and supervisors, and no contact with the public. (Tr. 62). According to Ms. Gonzalez, such an individual would be unable to perform plaintiff's past work. Other jobs were available in the national economy, such as collator operator, housekeeping cleaner, and addresser. (Tr. 62-64). All work would be precluded if the individual was limited to no contact with coworkers or supervisors. (Tr. 64).

**B.      Medical Evidence**

1.      Medical Records

The medical records open in November 2013 with notes from plaintiff's ongoing treatment at Community Treatment, Inc. (Comtrea), where plaintiff received psychiatric and community case management (CCM) services.[7] In November and December 2013, plaintiff was working at Goodwill 30 to 35 hours a week and taking care of her apartment and her children.

---

[5] Plaintiff had previously worked as an assistant store manager, a hardware supervisor, and a shipping and receiving supervisor at a records center. (Tr. 62).

[6] As discussed below, the ALJ determined that plaintiff has the RFC to perform light work, which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). The Court assumes that the reference to 100 pounds is a transcription error.

[7] Plaintiff received medication management from psychiatrist Jhansi Vasireddy, M.D., and nurse practitioner M. Susan Dawson, PMHNP-BC. She received community case management from Sara Ryan, LMSW, and Crystal Figge, LPC.

(Tr. 292, 291, 324-25). Her diagnoses were major depressive disorder, recurrent, mild; and PTSD. Her Global Assessment of Functioning score was 70. On mental status examination, she was well oriented, well groomed, and made good eye contact. She did not have suicidal ideation, delusions, or hallucinations. She complained of decreased energy and motivation. She was prescribed Zoloft for depression and Ambien for insomnia. In February 2014, Ms. Dawson added Wellbutrin when plaintiff complained of continued fatigue. (Tr. 290). In March 2014, plaintiff participated in the development of an annual treatment plan. (Tr. 313-19). At that time, plaintiff was working 32 hours a week and parenting four boys, three of whom took medication for hyperactivity. (Tr. 289). She described herself as independent and a hard worker. Although she liked the job and her co-workers, her income was not adequate to meet her expenses and she was reliant on support from her parents. In addition, her boyfriend was incarcerated and not due to be released for another two years. She reported that she became overwhelmed by the various stressors and had a hard time getting up and going to work. It was noted that she was on probation. In July 2014, she reported that she would like to continue receiving services even after her probation ended in August. (Tr. 303-04).

There were no significant changes in plaintiff's circumstances or presentation in the next three months. (Tr. 307-08; 288, 287, 303-04). On October 7, 2014, however, Ms. Dawson noted that plaintiff's treatment with Wellbutrin and Zoloft had failed. (Tr. 285-86). Plaintiff stayed in bed for a few days, during which she experienced some suicidal ideation. She lost her job but was looking for another one.[8] Her oldest son had dropped out of high school and moved in with his father, which she found upsetting, but she was taking care of her three younger sons. On

---

[8] Three weeks later, plaintiff told Ms. Ryan that she quit a job because she was frustrated by a cut in her hours. (Tr. 296).

examination, plaintiff's mental status remained stable, with a GAF of 70. Ms. Dawson discontinued plaintiff's prescriptions for Wellbutrin and Zoloft and prescribed Ambien and the antidepressant Fetzima. On October 27, 2014, plaintiff met with Ms. Ryan for half an hour, with Ms. Dawson present for the second half of the session. Ms. Ryan noted that plaintiff was crying. She had stopped taking her medications[9] and experienced an episode of suicidal thought in which she planned to overdose on heroin. Ms. Ryan suggested that plaintiff come to Comtrea for more frequent sessions. (Tr. 295-96). In her notes, Ms. Dawson stated that plaintiff was feeling much better and was able to get out of bed, shower, clean, and take care of her tasks. She was "very happy" with Fetzima. She continued to require medication to sleep. (Tr. 284). Ms. Dawson directed plaintiff to gradually increase the dosage of Fetzima and continued her prescription for Ambien. Plaintiff remained stable in November and December 2014, despite ongoing financial stress. (Tr. 293-94, 283).

Plaintiff was assigned a new CCM, Crystal Figge, in early 2015. (Tr. 336). In February 2015, plaintiff told Ms. Figge that she had been trying to kill herself since age 13. (Tr. 356-57). She was currently on unemployment and applying for disability. She was scheduled for a job interview the following day, but she was doubtful about how suitable it was. Nonetheless, she knew that her children needed financial stability. She stated that her medications were effective but did not seem to "last long enough." On March 10, 2015, plaintiff and her mother met with

---

[9] Plaintiff told Ms. Dawson that she used up the Fetzima and had been unable to get more. (Tr. 284).

Ms. Figge.[10]  Plaintiff reported that she had felt suicidal in the last week.  (Tr. 449-50).  She had rejected a job working the third-shift and her application for disability had been denied.[11]

Ms. Figge and plaintiff completed an annual assessment on March 24, 2015.  (Tr. 442-48).  Plaintiff reported that she felt like she hadn't made any progress and it had "all gone downhill."  She struggled with depression, anxiety, and loneliness.  She frequently had suicidal ideation.  She struggled to cope with daily frustrations and felt overwhelmed.  She had no energy and felt like she would kill herself if she did not take her medication.  Ms. Figge noted that plaintiff's ability to manage the activities of daily living and her household had changed in that plaintiff struggled to get up in the morning and was not "motivated to do what needs to happen." (Tr. 442).  In addition, she was presently unemployed due to mental health issues and was working to get disability.  Ms. Figge noted that plaintiff expressed an interest in counseling to assist her with coping skills and symptom management.  Plaintiff was diagnosed with major depressive disorder, recurrent, moderate; PTSD; and "observation of other suspected mental condition."  She was taking Xanax, Latuda, Fetzima, and Ambien.  On mental status examination, plaintiff was described as anhedonic and depressed, with insomnia, and a desire to avoid other people.  She was easily and often distracted and had memory deficits for the recent past.

The day after she completed the annual summary, plaintiff was evaluated at Mercy Hospital Jefferson emergency department for suicidal ideation after having an argument with her

---

[10] The progress note states that Ms. Figge met with plaintiff after her appointment with her psychiatrist. The record does not include any notes from that appointment.

[11] She also reported that she had been prescribed a higher dosage of the medication Latuda.  The Court has not located the record in which Latuda was prescribed for the first time.

ex-husband. (Tr. 561-62). She had used cocaine that day. Her home medications were listed as Xanax, Latuda, Zoloft and Ambien; there was no mention of Fetzima. (Tr. 568-69). She was guarded, anxious, and tearful, as well as disheveled and unwashed. She stated that she had decreased sleep, decreased appetite, with frequent crying and irritability, but no hallucinations. She also reported that she had a history of bipolar disorder and anxiety and that she was sometimes compliant with her medications. (Tr. 574). Plaintiff was not considered a reliable historian because she gave conflicting accounts. She was given Ativan for anxiety and admitted to the behavioral health unit for treatment with medication and therapy with a focus on coping mechanisms, problem-solving skills, and improving her insight. (Tr. 566, 577). Her diagnoses on admission were bipolar disorder, mixed episode, and polysubstance abuse, with a GAF of 35. (Tr. 573). Plaintiff was discharged on March 27, 2015, after showing significant improvement. (Tr. 586).

Plaintiff received significant financial and emotional support from her parents following her discharge from the hospital. In exchange, she worked for them 8 to 10 hours a day. She also sold plasma and picked up odd jobs with neighbors. Plaintiff's mother began accompanying her to appointments at Comtrea. They reported that plaintiff's suicidal ideation occurred after her ex-husband pressured her into sexual contact in order to see her son. (Tr. 434-35). He continued to apply pressure to her throughout the coming months and she continued to feel depressed and anxious. (Tr. 427-29). She began to have panic attacks and was increasingly unwilling to engage with people outside the family, (Tr. 427, 426, 420, 418-19, 405-06, 407), although she did go camping with her sons and travel with her boyfriend's sister and a cousin. (Tr. 420, 418-19). She also began to experience more flashbacks of the accident in which Nick was killed.

(Tr. 432-33, 429-30, 423).  In addition, plaintiff had quite a bit of agoraphobia and was unable to sit through a movie.  (Tr. 407).  Ms. Figge began addressing coping skills in her appointments with plaintiff and Ms. Dawson made changes to plaintiff's medications: in June 2015, she increased plaintiff's Zoloft and added the beta blocker propranolol;[12] in October, she added the alpha-blocker Prazosin to address flashbacks.  (Tr. 429-30, 426).  Later in 2015, plaintiff reported increased tension with her mother, who had taken control of plaintiff's "cards," including her food stamp card.  (Tr. 410-11, 405-06).  In December 2015, her middle son attempted suicide. (Tr. 405-06).

In early 2016, plaintiff's boyfriend Dino was released from prison after more than three years.  Plaintiff reported that they had a lot of conflict and her anxiety had increased because Dino was pushing her to go out and visit others, while she wanted to stay at home and avoid other people.  (Tr. 399-400).  On March 14, 2016, Dino accompanied plaintiff to see Ms. Dawson. (Tr. 397).  They reported that plaintiff was unable to break through her depression and stayed in bed all the time.  Ms. Dawson discontinued Fetzima, continued Zoloft and Xanax, resumed Ambien for sleep, and started plaintiff on Rexulti.[13]  In early April 2016, plaintiff reported that she had obtained a restraining order against one of her sons, at her mother's insistence.  (Tr. 395-96).  She was having a great deal of conflict with Dino, her sons, and her mother, and had walked out of a family meal at a restaurant.  She had an increase in obsessive thoughts and compulsive behaviors and was not sleeping well.  Later in April, plaintiff noted

---

[12] "Beta-blockers can be helpful in the treatment of the physical symptoms of anxiety, especially social anxiety."  https://www.anxieties.com/159/beta-blockers#.XDUWfWl7mos (last visited Jan. 8, 2019).

[13] Rexulti is an atypical antipsychotic used to treat symptoms of schizophrenia and depression that does not respond to antidepressants alone.  See https://medlineplus.gov/druginfo/meds/a615046.html (last visited Jan. 9, 2019).

some improvement with Rexulti in that her suicidal ideation and anxiety had been reduced, but she was unable to leave the house after midafternoon because the effects wore off. (Tr. 393-94).

In the May 2016 annual assessment (Tr. 385-92), Ms. Figge noted that plaintiff continued to struggle with anxiety. She did not "go into the community for any reason" and thus did not follow up with community resources or activities. (Tr. 391). Her avoidance of situations that made her uncomfortable affected her daily functioning and caused conflict with her boyfriend, on whom she was very dependent. She continued to report recent suicidal thinking. She was not working due to her anxiety and "she does not have sufficient coping skills to manage her day to day functioning in an effective way." Ms. Figge recommended that plaintiff continue with her psychiatric care and case management services and add individual professional psychosocial rehabilitation services to assist her in developing coping skills. Plaintiff's diagnoses were PTSD; major depressive disorder, recurrent, moderate; agoraphobia with panic attacks; and insomnia. She was prescribed Xanax, Rexulti, Zoloft, Ambien, and trazadone.

In June and July 2016, Ms. Dawson noted that plaintiff continued to struggle with anxiety in public but was trying to go out more. (Tr. 378-80, 376-77). Her medications were helping to manage some of the trauma memories and flashbacks with a reduction in her anxiety and panic attacks. She was working part-time through the Disability Resource Association.

In May 2016, she sought treatment for hip and shoulder pain. (Tr. 726-36). She was diagnosed with synovial cysts in the left hip, torn right rotator cuff, and degenerative joint disease in the right acromioclavicular joint. (Tr. 495). In August 2016, she had arthroscopic repair of her right rotator cuff. (Tr. 491-503). She subsequently sought emergency care for a

superficial infection at the wound site. (Tr. 622). She was prescribed hydrocodone-acetaminophen for pain.

Plaintiff continued to experience panic attacks and anxiety. In September 2016, she told Ms. Dawson that she had a hard time coming to the Comtrea office. (Tr. 373-75). Ms. Dawson discontinued Xanax and prescribed diazepam to treat her agoraphobia and panic attacks. On October 20, 2016, Ms. Figge noted that plaintiff was spending a lot of time in bed and not interacting much. She noted a number of psychosocial stressors, including the loss of her Medicaid insurance, conflict with her boyfriend, and text messages from her ex-husband. The following day, plaintiff was admitted to Mercy Hospital Jefferson after swallowing 20 Aleve tablets and a full bottle of Xanax in response to conflict between her boyfriend and ex-husband. (Tr. 631-67). She tested positive for amphetamines, benzodiazepines, cocaine and marijuana. (Tr. 639). On admission, she was disheveled, depressed, anxious, and irritable, but cooperative. She reported that she had broken up with her boyfriend, which she characterized as a positive development. (Tr. 640). She was diagnosed with bipolar disorder, currently depressed; polysubstance abuse; and personality disorder, not otherwise specified. Her GAF score was 35. (Tr. 639). At discharge on October 24, 2016, it was noted that plaintiff's attempted overdose was purely impulsive. (Tr. 667-68). She was discharged with prescriptions for Zyprexa to treat bipolar disorder and trazodone and Ambien for insomnia. Her prescriptions for diazepam and Latuda were discontinued. (Tr. 669). On November 4, 2016, plaintiff was readmitted after attempting suicide by overdosing on Ambien and Ativan. (Tr. 683). She again tested positive for marijuana, benzodiazepines, opiates, and cocaine. (Tr. 708). She was discharged on November 8, 2016.

On November 14, 2016, plaintiff told Ms. Dawson that she was hearing voices and wanted to restart Rexulti. (Tr. 366-68). Ms. Dawson noted that plaintiff was clean and well groomed, but made almost no eye contact, spoke only when spoken to, and was very highly anxious. Ms. Dawson diagnosed plaintiff with major depressive disorder with psychotic features, PTSD, agoraphobia with panic attacks, and insomnia, and prescribed Zoloft, Rexulti, gabapentin, clonidine, Effexor, Ambien, and trazadone.

On December 28, 2016, plaintiff was again admitted to Mercy Hospital Jefferson after making superficial cuts to her wrist with an axe. (Tr. 505-41). She reported hearing constant voices saying, "You're not worth it." She presented with depressed mood, anxiety, poor sleep, poor energy, poor appetite, severe anhedonia, and auditory hallucinations. (Tr. 514). The evaluating physician noted that plaintiff had "poor" or "limited" coping skills. (Tr. 513, 519). She was discharged on January 1, 2017. (Tr. 541). Her medications at discharge were gabapentin, Seroquel, Ambien, trazadone, and Effexor. (Tr. 539-40). There is no mention of Rexulti in plaintiff's medication list at admission or discharge. (Tr. 527-28).

2.    Opinion evidence

On March 3, 2015, State agency consultant Stephen S. Scher, Ph.D., completed a Psychiatric Review Technique form based on a review of the record. (Tr. 75-77). Dr. Scher concluded that plaintiff had medically determinable impairments in the categories of 12.04 (affective disorders) and 12.05 (anxiety disorders). Dr. Scher found that plaintiff had mild restrictions in the activities of daily living and moderate difficulties in maintaining social functioning, and in maintaining concentration, persistence and pace. She had no repeated episodes of decompensation of extended duration. Dr. Scher concluded that medical evidence

supported plaintiff's allegations of major depressive disorder and PTSD, but not anxiety, even though she was taking medication for anxiety. Dr. Scher noted that plaintiff had been seeking treatment on a regular basis from Comtrea and had a history of suicidal ideation but had never attempted to harm herself. Dr. Scher also noted Ms. Rinkins' observation that plaintiff seemed very delicate and burst into tears a number of times while completing the function report. Dr. Scher completed a mental residual functioning capacity assessment in which he found that plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted; work with the general public; accept criticism; and get along with peers and coworkers. She was otherwise without significant limitations. (Tr. 78-79). The ALJ assigned this opinion significant weight. (Tr. 21).

Also on March 3, 2015, Susan Dawson completed a questionnaire sent by the State agency. (Tr. 363). Ms. Dawson stated that plaintiff was "severely depressed [and] unable to perform daily functions at times." She was unable to "relate to her family when having depressive episodes," and was "unable to concentrate or focus with anxiety symptoms." In addition, plaintiff had been fired due to the severity of her depression. These limitations were based upon plaintiff's diagnosis of major depressive disorder with psychotic features. The ALJ gave this opinion[14] little weight. (Tr. 21-22). The ALJ determined that the opinion was inconsistent with the treatment records showing relatively normal mental status evaluations and moderate GAF scores.

---

[14] The ALJ mistakenly attributed this opinion to Dr. Vasireddy.

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act.  See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process).  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Pate-Fires, 564 F.3d at 942.  "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations."  Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines

whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v.

<u>Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." <u>Id.</u>; <u>see also</u> <u>Stewart v. Sec'y of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. <u>Buckner v. Astrue</u>, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. <u>Id.</u>; <u>see</u> <u>also</u> <u>McNamara v. Astrue</u>, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. <u>The ALJ's Decision</u>

The ALJ's decision in this matter conforms to the five-step process outlined above. (Tr. 10-23). The ALJ found that plaintiff met the insured status requirements of the Social Security act through September 30, 2017. She also found that plaintiff had not engaged in substantial gainful activity since September 24, 2014, the alleged onset date. (Tr. 12). At steps two and three, the ALJ found that plaintiff had the following severe impairments: obesity, degenerative joint disease of the right shoulder post rotator cuff repair, synovial cysts in the hips, major depressive disorder, PTSD, schizoaffective disorder,[15] agoraphobia, personality disorder, and

---

[15] The diagnosis of schizoaffective disorder appears only in an annual assessment completed on October 9, 2014, by a Comtrea community case manager named Norinee Thomas, PLPC. (Tr. 298-301). Plaintiff's name does not appear on this record and the Court concludes that its inclusion in this record is a mistake. First, Ms. Thomas is not one of the providers of record for plaintiff. Second, plaintiff's annual evaluations were due in May, not October. Third, the document makes reference to the patient's diabetes

polysubstance abuse.  Id.  The ALJ also determined that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. The ALJ found that plaintiff's mental impairments, considered singly and in combination, did not meet the listing criteria for listing 12.04 (affective disorders), 12.06 (anxiety disorders), 12.08 (personality and impulse-control disorders), or 12.15 (trauma- and stressor-related disorders).[16]  (Tr. 13).  For the purposes of considering the paragraph B criteria for mental impairments, the ALJ found that plaintiff had moderate limitations in understanding, remembering, or applying information; marked limitations in interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and moderate limitations in adapting or managing herself.  With respect to the paragraph C criteria, the ALJ found that, although plaintiff had a medically documented history of mental disorders over a period of a least two years with medical treatment, there was no evidence of marginal adjustment such that she has minimal capacity to adapt to changes in her environment or a "fragile" adaptation to the requirements of daily life.  (Tr. 13-14, citing 12.00G2c).

The ALJ next determined that plaintiff had the RFC to perform light work in that she was able to lift, carry, push or pull 20 pounds occasionally and 10 pounds frequently; could sit and stand or walk for 6 hours in an 8-hour day; but was unable to climb ropes, ladders and scaffolds, and was limited to occasional overhead reaching.  She was further limited to simple, routine

---

and appendectomy, conditions which do not apply to plaintiff.  In addition, the ALJ noted at the outset of the hearing that the file as submitted by plaintiff's counsel included medical records from another client with the same last name and similar first name.  (Tr. 32).

[16] Effective January 17, 2017, the Administration issued Revised Medical Criteria for Evaluation Mental Disorders, adding new listings and revising the paragraph B criteria. https://www.federalregister.gov/documents/2016/09/26/2016-22908/revised-medical-criteria-for-evaluating-mental-disorders.

tasks with minimal changes in job setting and duty, with no contact with the public, only occasional contact with coworkers and supervisors, and no tandem tasks. (Tr. 14). Plaintiff agrees with the ALJ's assessment of her physical RFC. In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as plaintiff's testimony and written reports regarding her abilities, conditions, and activities of daily living. (Tr. 14-22). While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's statements regarding their intensity, persistence and limiting effect were "not entirely consistent with" the medical and other evidence. (Tr. 15). The ALJ additionally determined that plaintiff's drug use was not a contributing factor to the determination of disability. (Tr. 21).

At step four, the ALJ concluded that plaintiff was unable to perform her past relevant work. Her age placed her in the "younger individual" category on the application date. She had at least a high school education and was able to communicate in English. (Tr. 22). Transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that plaintiff was not disabled, regardless of any transferrable skills. Id. Based on the vocational expert's testimony, the ALJ found at step five that someone with plaintiff's age, education, and residual functional capacity could perform work that existed in substantial numbers in the national economy, such as collator operator, housekeeper/cleaner, and addresser. (Tr. 23). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act, from September 24, 2014, through June 13, 2017, the date of the decision. Id.

# V. **Discussion**

Plaintiff argues that the ALJ incorrectly applied the paragraph B criteria and improperly failed to give significant or controlling weight to the opinion of Ms. Dawson, her treating mental health provider.

## A.       **Paragraph B Criteria**[17]

In order to satisfy the paragraph B requirements, a claimant must have one "extreme" limitation or two "marked" limitations in the following areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself.  The ALJ found that plaintiff had marked limitations in interacting with others and was moderately limited in the other three categories.  Plaintiff contends that the ALJ incorrectly failed to find that she was markedly limited in the category of adapting or managing oneself.  This area is concerned with:

> the abilities to regulate emotions, control behavior, and maintain well-being in a work setting.  Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.  These examples illustrate the nature of this area of mental functioning.  We do not require documentation of all of the examples.

---

[17] Plaintiff also argues that the ALJ's error at step 2 renders the RFC determination incorrect.  [Doc. # 18 at 3, 8].  The ALJ noted that the limitations identified in the paragraph B criteria are not an RFC assessment, however.  "The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment."  (Tr. at 14).  The RFC "reflect[ed] the degree of limitation" found in the paragraph B analysis.   Id.  This is consistent with policy interpretation from the Social Security Administration.  See Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996)  (limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, E4. A claimant has a "marked limitation" when her "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, F2e.

Here, the ALJ determined that plaintiff was moderately limited in this area of mental functioning because she was able to care for her children and distinguish between acceptable and unacceptable work performance, and demonstrated the ability to function independently. In addition, although she periodically did not shower because of her symptoms, her treating sources consistently rated her grooming and hygiene as good. (Tr. 14).

Plaintiff's primary argument is that the ALJ failed to acknowledge her poor coping skills in assessing her limitations in the category of adapting or managing oneself.[18] Plaintiff further argues that coping skills are an essential component of adaptation. Defendant has not addressed this argument.

A review of the record shows that plaintiff's lack of coping skills was identified as a treatment issue at her annual assessment in March 2015. (Tr. 477). Between that date and the close of the record in December 2016, plaintiff had four brief periods of inpatient treatment for suicidal ideation or attempts, despite at least 26 documented contacts with treatment professionals at Comtrea and multiple adjustments to her medication regime. During this same period, she experienced an increase in flashbacks and agoraphobia. The Court finds that the

---

[18] Plaintiff also argues that the ALJ ignored evidence of conflict or disruption in plaintiff's relationship with her children. In particular, one child decided to move in with his father, who then applied pressure to plaintiff to engage in sex in exchange for contact with that child. In April 2016, plaintiff obtained a restraining order against one of her sons after he hit her. (Tr. 395). In December 2016, one of her sons interrupted her attempt to cut her wrist. (Tr. 513). The Court agrees with plaintiff that this is evidence of some degree of dysfunction, however, it is properly accounted for in the ALJ's determination that plaintiff had marked limitations in the area of interacting with others.

ALJ's failure to address plaintiff's coping skills in completing the paragraph B assessment was an error requiring remand.

Because this matter will be remanded, the Court addresses an additional issue. The physicians at Mercy Hospital Jefferson diagnosed plaintiff with bipolar disorder on each of her four admissions. (Tr. 566, 512, 684, 637). The ALJ discounted the diagnosis of bipolar disorder because it was inconsistent with the diagnoses assigned by plaintiff's treatment providers at Comtrea and because there was "little evidence of manic phases during the relevant period that would support a bipolar diagnoses." While the inconsistency is puzzling, the diagnosis of bipolar disorder is an indication that the hospital physicians believed plaintiff had a major mental illness, despite the absence of any evidence that she experienced manic episodes. The ALJ's decision to discount the diagnosis on that basis appears to be an unwarranted independent medical finding. See Pate-Fires v. Astrue, 564 F.3d at 946-47 (ALJs may not make independent medical findings).

**B.     Opinion Evidence**

The record contains two medical opinions. Dr. Scher, a nonexamining source, determined that plaintiff had at most moderate limitations, while Ms. Dawson, a nurse practitioner, opined that plaintiff had limitations that preclude employment.[19] The ALJ gave greater weight to the opinion of Dr. Scher than that of Ms. Dawson, finding it was inconsistent with the relatively normal mental status evaluations reflected in Ms. Dawson's treatment notes.

---

[19] The Court notes that both opinions were rendered before plaintiff had four hospitalizations for suicidal ideation and attempts. Dr. Scher specifically noted that plaintiff had no history of self-harm in assessing her work-related limitations.

Plaintiff argues that Ms. Dawson's opinion was entitled to controlling or significant weight because she was a treatment provider.

The ALJ mistakenly attributed Ms. Dawson's March 3, 2015, to Dr. Jhansi Vasireddy. (Tr. 21). The Court agrees with defendant that this error had no practical effect on the decision. First, the ALJ compared the March 2015 opinion to Ms. Dawson's treatment notes. Second, because plaintiff's claim was filed before March 27, 2017, Ms. Dawson was characterized as an "other medical source," while Dr. Vasireddy was an "acceptable medical source." 20 C.F.R. § 404.1502 (defining nurse practitioner as "other source" for claims filed before March 27, 2017). The ALJ arguably gave the opinion greater deference than it would have received had it been properly attributed to Ms. Dawson in the first place. See Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (well-supported opinion of a treating physician entitled to controlling weight if not inconsistent with other substantial evidence); Franklin v. Berryhill, No. 4:17CV2298 HEA, 2018 WL 4679736, at *3 (E.D. Mo. Sept. 28, 2018) ("other sources" are not entitled to controlling weight) (citing LaCroix v. Barnhart, 465 F.3d 881, 885-86 (8th Cir. 2006)).

* * * * *

For the foregoing reasons, the Court finds that the ALJ's decision is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.


_/s/ John M. Bodenhausen_
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of January, 2019.